# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
HAIGHT, CAMPANELLA, and WOLFE
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Staff Sergeant FULGENCIO VIDAL**
**United States Army, Appellant**

ARMY 20130892

Headquarters, 1st Cavalry Division (Rear)(Provisional)
Rebecca K. Connally, Military Judge
Colonel R. Tideman Penland, Jr., Staff Judge Advocate (pretrial and recommendation)
Lieutenant Colonel Michael D. Jones, Staff Judge Advocate (addendum)


For Appellant: Captain Heather L. Tregle, JA; Daniel Conway, Esquire (on brief); Captain Heather L. Tregle, JA; Daniel Conway, Esquire (on supplemental assignment of error); Captain Heather L. Tregle, JA; Daniel Conway, Esquire (on reply brief).

For Appellee: Colonel Mark H. Sydenham, JA; Major Steven J. Collins, JA; Captain Linda Chavez, JA (on brief); Colonel Mark H. Sydenham, JA; Lieutenant Colonel A.G. Courie III, JA; Major Steven J. Collins, JA; Captain Linda Chavez, JA (on supplemental brief).


21 June 2016

---------------------------------
OPINION OF THE COURT
---------------------------------

WOLFE, Judge:

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of two specifications of aggravated sexual assault and one specification of an indecent act, all in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 (2006 & Supp. IV 2010) [hereinafter UCMJ]. The court-martial sentenced appellant to a dishonorable discharge, confinement for fifteen years, forfeiture of all pay and allowances, and a reduction to the grade of E-1. The convening authority approved the findings and sentence as adjudged.[1]

---

[1] The convening authority deferred the forfeiture of $900 pay per month from 13 November 2013 until 17 September 2014.

On appeal, appellant initially raised three assignments of error. In a supplemental assignment of error, raised by questions brought about during the course of the appeal, appellant asserts that the convening authority was never presented with all of his Rule for Courts-Martial [hereinafter R.C.M.] 1105 submissions. For the reasons explained below, we grant relief on appellant's supplemental assignment of error and direct a new post-trial review and action on the case by the convening authority. Accordingly, we do not address the remainder of appellant's assigned errors at this time. Additionally, we direct a hearing pursuant to *United States v. DuBay*, 17 U.S.C.MA. 147, 37 C.M.R. 411 (1967), to resolve an outstanding issue regarding appellant's right to conflict-free appellate counsel.

## BACKGROUND

The offenses in this case arise out of a single incident in Afghanistan in which appellant and Specialist (SPC) JA had sexual intercourse with SPC JO. Appellant was convicted of aggravated sexual assault both as a principal (for having sex with SPC JO under a bodily harm theory) and under an aider and abettor theory for holding SPC JO's arms while SPC JA had sexual intercourse with her.[2]

### A. Evidence at Trial

In 2011–2012, SPC JO was serving in Afghanistan refueling helicopters as a petroleum supply specialist. She was nearing the end of her deployment when she began hanging around appellant and SPC JA. Specialist JO admitted that she was attracted to SPC JA.

One night in May 2012, SPC JO went to hang out with the two soldiers in a bunker near appellant's tent. Specialist JA handed her a bottle of red Gatorade. As SPC JO took a few gulps, she said she could taste some alcohol in the drink. Later, SPC JO stated that one of the two soldiers pulled out a rolled "cigarette" which was then passed between the three of them. After taking a few puffs, SPC JO testified that she started feeling very "giggly" and "kind of off balance."

Specialist JO testified that the two male soldiers tried to convince her to go "somewhere private," which she refused. They then started touching her and tried to take off her physical training shorts. She pushed their hands away. Then, appellant

---

[2] While appellant was convicted of two specifications of aggravated sexual assault, he was acquitted of two specifications of rape for these same acts.

lifted her up by her armpits with his hands. Initially, SPC JO thought he was helping her, but then appellant began trying to convince SPC JO to have sex with SPC JA. Specialist JO testified that she told appellant and SPC JA "six or seven times" that she did not want to have sex with them. Over her objections, both soldiers then had sex with her.

Specialist JO explained to the court that in the moment she was "confused" and "conflicted." She considered both men to be her friends and comrades in arms. She stated that she felt guilty for not screaming, but also that she was worried that reporting them would be "betraying them because they were in the military." She said she did not want to "admit to being raped," feel like a victim, be "pitied" and that she wanted "to basically feel like normalize it [sic]."

At some point shortly after the assault, SPC JO said she sought out SPC JA to talk about what had happened. During the discussion, SPC JA told her he felt bad and told her that "he felt more like they had raped [her]."[3] During this encounter with SPC JA, SPC JO testified she ended up having consensual sexual intercourse with SPC JA.

After redeploying, SPC JO ran into appellant while turning in gear at the Central Issue Facility. She then confronted appellant during a twelve-minute conversation which she recorded on her cellphone. Approximately two-thirds into the recording, SPC JO tells appellant through sobs that "I just wish you would have stopped when I said no." For approximately twenty-six seconds, appellant says nothing as SPC JO continues to cry. Appellant, who begins to cry himself, then said the following:

> I'm sorry [SPC JO]. Hey, look at me. Look at me. Look.
> Look at me. From the bottom of my heart - - look - - from
> the bottom of my heart, I am sorry. If that's going to help
> you somehow - - look - - I'm crying because - - I never
> intended that for you, ok? Really. I swear on my life that
> I didn't plan that, I didn't want that to happen to you. I
> didn't even - - that was - - I think it was alcohol and we
> were smoking, and we went to the emotions and everybody
> just parties - - I thought it was like a party but then, it did
> turn out another way. I promise you, I swear, that I didn't
> plan - - and [SPC JA]'s not a bad person either. None of

---

[3] Specialist JA did not testify at appellant's trial.

> us would plan to do harm to you. None of us. [Specialist JA] [sic] a good person and I think we are good guys even if we did something like that. But we don't do things - - we've never been evil. [Specialist JA] is my best friend, I'm the godfather of his daughter, he's never done something like that. And never to hurt a woman at all or us [sic]. I promise you that. I am ashamed, and I feel so bad, and the next day I felt so bad.

At trial, the government presented the testimony of SPC JO and introduced the recording of appellant's admissions. Specialist JO admitted that shortly after having consensual sex with SPC JA she told her husband about the sexual encounter. She did not, however, immediately tell him that she had been sexually assaulted.

The defense theme at trial was that SPC JO had fabricated a sexual assault allegation out of a consensual event in order to save her marriage. Specialist JO admitted on cross-examination that her marriage was falling apart because of her admitted infidelity. The defense called SPC JO's husband who testified he was "very upset" upon learning that she had cheated on him. He also admitted that this conduct enraged him and he contemplated divorce. Specialist JO's husband further testified that she told him about the sexual assault in August 2012 after she had redeployed. Specialist JO's husband admitted that after finding out about the sexual assault he was "quite a bit" less angry with her and that he "looked at it a different way."

The defense also admitted statements made by SPC JO that she had cheated on her husband while deployed. The defense theory, that SPC JO was concealing her sexual activity in order to preserve her marriage, faced some difficulty in that SPC JO did not shy away from admitting that she had, in fact, cheated on her husband.

*B. Post-trial*

Specialist JA was to be tried after appellant. Prior to the beginning of trial on the merits, however, the convening authority granted SPC JA's request to be administratively discharged in lieu of trial by court-marital, a form of discharge commonly referred to as a "Chapter 10." *See* Army Reg. 635-200, Personnel Separations: Active Duty Enlisted Administrative Separations [hereinafter AR 635-200], Chapter 10 (6 Jun. 2005; Rapid Action Revision 6 Sep. 2011). However, when appellant submitted his own Chapter 10 request as his R.C.M. 1105 matters, the convening authority rejected the request.

*C. Appeal*

On appeal, one of appellant's assigned errors is that his trial defense counsel was ineffective for not seeking SPC JO's mental health records. Appellant asserts that in SPC JA's court-martial, it was the pretrial discovery of those records that resulted in SPC JA receiving a Chapter 10 discharge. He further asserts that *but for* the trial attorney's error, appellant would similarly have received an administrative discharge.

In response, the government disagreed with that assertion and submitted an affidavit from the chief of justice explaining why only SPC JA's Chapter 10 request was supported. The chief of justice explained that the government's case against SPC JA was significantly weaker. Specifically, she explained that SPC JA's case was far more likely to result in an acquittal because: 1) unlike appellant, there were no recorded incriminating statements made by SPC JA; 2) the victim had engaged in counter-intuitive behaviors with SPC JA (to include post-assault consensual intercourse) that were difficult to explain; and 3) when interviewed by prosecutors after his conviction in preparation for SPC JA's court-martial, appellant, operating under a grant of immunity, gave responses that the prosecutors believed indicated that he was prepared to testify falsely in favor of SPC JA.

In the record forwarded to this court, appellant's Chapter 10 request was the only matter submitted to the convening authority by or on behalf of appellant under R.C.M. 1105. While it is clear that appellant and his counsel possessed SPC JO's mental health records at the time, the Chapter 10 request made no mention of them nor included them by reference.

The unusual circumstance in this case is that SPC JA's attorney, appellant's post-trial attorney, and appellant's civilian appellate counsel are all the same person.

In initially attempting to resolve this assigned error, we found ourselves in a quandary: On appeal, counsel argued that the trial defense counsel was ineffective for not seeking to find out the contents of Specialist JO's mental health records. Based on the record of trial, that same counsel–with *actual* knowledge of the contents of these mental health records via his representation of SPC JA–did not assert their relevance in seeking appellant's Chapter 10 discharge. In other words, by arguing that the trial defense counsel was ineffective and lost appellant's chance at an administrative discharge, it appeared he was also arguing his own ineffectiveness during post-trial representation of appellant. This presented us with what appeared to be a conflict of interest. *See* AR 27-26, Legal Services: Rules of Professional Conduct for Lawyers, Appendix B, Rule 1.7, (1 May 1992). "A lawyer shall not represent a client if the representation of that client may be materially

limited by . . . the lawyer's own interests. . . ." AR 27-26, Appendix B, Rule 1.7*(b)*. On 25 April 2016 we met with the Chiefs of the Government and Defense Appellate Divisions to discuss the possibility of a conflict of interest and the possibility of assigning additional, conflict free, counsel.

Immediately subsequent to this meeting, appellant filed his supplemental assignment of error. In short, the brief alleges that counsel did, in fact, argue that the contents and admissions within SPC JA's mental health records warranted an administrative discharge–but those documents were never presented to the convening authority.

In other words, the supplemental assignment of error attempted to moot the issue of whether there was a potential conflict by arguing instead that there was an error of omission in the post-trial processing of appellant's case. We granted appellant's motion to attach additional emails and documents to the record.

The emails and documents submitted by the defense demonstrate that appellant's counsel made two Chapter 10 requests. The initial R.C.M. 1105 submission from counsel mentions SPC JO's mental health records as follows:

> I will not discuss sealed matters in this clemency request;
> however, during the course of [SPC JA]'s case I
> personally spoke to the treating psychiatrist [of SPC JO]
> during inpatient treatment. The doctor would have been
> an extremely damaging witness to impeach [SPC JO's]
> credibility.[4]

The initial Chapter 10 request, however, was administratively returned to counsel for failing to follow the regulatory requirement that the submission be personally signed by the appellant. *See* AR 635-200, para. 10-2c. In a series of subsequent emails, this omission was corrected and appellant's counsel submitted a second Chapter 10 request. The second Chapter 10 submission signed by appellant, however, did not mention SPC JO's mental health records.

After receiving the second Chapter 10 request, the post-trial NCO emailed appellant's counsel to ask:

---

[4] It is important to note that the "sealed matters" referred to here were not part of appellant's record of trial. We presume that these records were appropriately sealed by the military judge in the trial proceedings of SPC JA held before the acceptance of his Chapter 10.

> . . . if the Post-Trial Chapter 10 was the full RCM
> 1105/1106 matters that you submitted.  Or was there any
> additional 1105 submissions[?]

Counsel's affirmative response ("[t]hat is correct") indicated that the second Chapter 10 request was the only submission under R.C.M. 1105.

Accordingly, appellant's sole R.C.M. 1105 submission to the convening authority was a Chapter 10 request that did not mention SPC JO's mental health records or any other mitigating or extenuating circumstances.

## LAW AND DISCUSSION

*A. Potential Conflict of Interest*

Prior to addressing the merits of any of appellant's assigned errors, we must first determine whether there is a potential conflict of interest in this case and, if so, how should it be resolved.

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI; see also *United States v. Cain*, 59 M.J. 285, 294 (C.A.A.F. 2004).  "Where a constitutional right to counsel exists . . . there is a correlative right to representation that is free from conflicts of interest."  *Wood v. Georgia*, 450 U.S. 261, 271 (1981).

An accused may waive his right to conflict-free counsel. *United States v. Davis*, 3 M.J. 430, 433 n.16 (C.M.A. 1977).  However, waivers must be voluntary, and they must be "'knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.'"  *Id*. (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)).  "Courts will indulge every reasonable presumption against the waiver of this right."  *United States v. Lee*, 66 M.J. 387, 388 (C.A.A.F. 2008) (citing *Brady* 397 U.S. at 748) (internal quotation omitted); *United States v. Murphy*, 50 M.J. 4, 10 (C.A.A.F. 1998) (an appellant is "entitled to have conflict-free counsel"); *Holloway v. Arkansas*, 435 U.S. 475 (1978).

"An attorney has an ethical duty to identify conflicts of interest concerning the attorney's representation of a client and to take appropriate steps to decline or terminate representation when required by applicable rules, regardless of whether a party-litigant has filed a motion to disqualify the attorney."  *United States v. Humpherys*, 57 M.J. 83, 88 n.4 (C.A.A.F. 2002); *see* Model Rules of Prof'l Conduct r. 1.16 (Am. Bar Ass'n 2016); *see also* AR 27-26, Appendix B, Rule 1.16.

This is not a case where a conflict of interest is raised as error.  *See United States v. Akbar*, ARMY 20050514, 2012 CCA LEXIS 247, at *38 (Army Ct. Crim.

App. 13 Jul. 2012) ("To establish an actual conflict of interest, appellant must show that (1) counsel actively represented conflicting interests and (2) that the "actual conflict of interest adversely affected his lawyer's performance.") (citations omitted). Rather, our concern is that there is potential conflict of interest during the pendency of the instant appeal.

We have identified three areas of concern.

### 1. Allegations of Ineffective Assistance of Counsel

As discussed above, the civilian attorney representing appellant on appeal also represented appellant in the post-trial processing of his case. Appellant's second assigned error asserts the trial defense counsel was ineffective in "inexcusabl[y]" not requesting SPC JO's mental health records. In briefing the issue, counsel asserted that the mental health records are "completely exculpatory" and that these records were the reason that appellant's co-actor, SPC JA, received a Chapter 10 discharge.

Our concern is that whatever should have been expected of the trial defense counsel in *seeking* to breach the privilege under Military Rule of Evidence [hereinafter Mil. R. Evid.] 513 and obtain SPC JO's mental health records, at least the same diligence would be expected of the counsel representing appellant post-trial. This is especially the case when the post-trial counsel had the records in hand, had *actual knowledge* of their "completely exculpatory" nature, and was submitting a request for a Chapter 10 on behalf of appellant. In other words, there is the potential for a conflict of interest when during the course of representation, by demonstrating the mistakes of the trial defense counsel, an attorney implicitly and simultaneously reveals the possibility that his or her own performance fell short.

Analysis of this issue is complicated by the confusing manner in which the R.C.M. 1105 matters were submitted. However, even assuming that both Chapter 10 requests should have been submitted to the convening authority, they would have only contained a passing reference to the mental health records, devoid of detail or context. More specifically, counsel stated that he "would not discuss" the mental health records. And as the mental health records of SPC JO were never part of appellant's trial, they were not otherwise before the convening authority. Instead, counsel asked the convening authority to rely on his personal unsworn assertion that he had talked to a potential witness who would have provided defense friendly testimony. It is hard to square counsel's assertion on appeal that the trial defense attorney was ineffective for not seeking the "completely exculpatory" mental health records with the manner in which civilian counsel's advocacy of that same issue– even assuming that the convening authority should have been provided both Chapter 10 requests as appellant now asserts–presented that same issue to the convening authority during the post-trial proceedings.

### 2. *Supplemental Assignment of Error*

In the supplemental assignment of error, appellant asks us to return the record of trial to the convening authority for a new action under Article 60, UCMJ. Appellant argues that this relief is warranted because his full R.C.M. 1105 matters were never presented to the convening authority. That is, appellant argues that *both* Chapter 10 requests should have been submitted to the convening authority.

Appellant's counsel submitted the supplemental assignment of error immediately after, and in response to, this court raising a concern about a conflict of interest. The supporting brief argues that the error in processing appellant's post-trial submissions is completely the fault of the government.

In other words, on notice of a potential conflict of interest, the brief to the supplemental assignment of error argues–sometimes tenuously–that any error during the post-trial processing falls not on the same defense counsel, but at the feet of the government. Of course, an attorney should advance the arguments that are in the client's best interests. If that argument possibly includes that it was the attorney himself who was at least partially responsible for the mistake, there is a potential conflict of interest. In other words, a potential conflict of interest arises when the best argument to be made for the client is contrary to the attorney's own interests. *See, e.g. United States v. Hicks,* 52 M.J. 70 (C.A.A.F. 1999) (discussing whether erroneous legal advice creates a conflict when client's reliance on that advice results in additional charges). An attorney who had not been involved at all during the trial stage could objectively argue that appellant is entitled to relief because of the government's errors, the trial attorney's errors, or some combination thereof.

Consider, for example, the arguments *not made* in support of appellant's request for a new convening authority action: (1) post-trial counsel erred when he agreed that the second Chapter 10 request "was the full 1105/1106 submissions"; and (2) when submitting matters under R.C.M. 1105, counsel did not include a copy of the sealed mental health records for the convening authority or adequately explain their significance.

### 3. *Representation of both Appellant and SPC JA*

"The potential for conflict of interest in representing multiple accused in a criminal case is so grave that ordinarily a lawyer should not represent more than one co-accused." AR 27-26, Appendix B, comment to Rule 1.7. "A lawyer who has formerly represented a client in a matter shall not thereafter . . . represent another person in the same or a substantially related matter in which the person's interests

are materially adverse to the interests of the client unless the former client consents after consultation." *Id.*, Appendix B, Rule 1.9(a).[5]

Appellant's first assignment of error argues that his sentence is disproportionately severe as compared to his co-actor, SPC JA. In his brief, appellant argues that appellant and SPC JA were co-actors who committed "closely related" offenses. *See United States v. Lacy,* 50 M.J. 286, 288 (C.A.A.F. 1999). If appellant meets his burden in establishing that the offenses are "closely related" the government must show that "there is a rational basis for the disparity." *Id.* This analysis requires this court to evaluate the relative culpability of the two individuals.

As discussed above, the lead counsel on appellant's appeal also represented SPC JA. The potential for a conflict of interest arises in this type of situation when counsel must address the relative culpability of the two co-actors. For example, arguments that SPC JA was more culpable (or even equally culpable) than appellant become difficult to make if you have continuing obligations to both individuals. More specifically, the government's brief argues that the disparate treatment of the cases was warranted because there was less admissible evidence of SPC JA's guilt. A conflict may arise if counsel's obligations to SPC JA preclude an adequate response to the government's arguments. "Loyalty to a client is also impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests." AR 27-26, Appendix B, comment to Rule 1.7.

We have previously held that under such circumstances, a waiver requires "the consent of both clients, not just one." *United States v. Beckley*, ARMY 9701282, 1999 CCA LEXIS 345, at *7 (Army Ct. Crim. App. 7 Sep. 1999).[6]

---

[5] Although the unclear chronology makes it difficult for us to analyze this issue, this is a case where the government sought to have appellant testify against SPC JA after appellant's trial. That is, having secured a fifteen-year sentence against appellant, the government sought appellant's cooperation in testifying against SPC JA. Again, appellant's counsel also represented SPC JA.

[6] Additionally, we note that counsel asserts in his brief that he was provided SPC JO's mental health records as part of his representation of SPC JA. Ordinarily, when such records are released pursuant to Mil. R. Evid. 513, they are accompanied by a protective order which usually requires that the records either be destroyed or returned to the court at the completion of the proceedings. Although counsel moved for this court to consider the records, and asserted that they were obtained during the court-martial of SPC JA, we were not provided with a copy of the order releasing the records.

*4. Resolution*

Our superior court has stated that when it comes to conflicts of interest, "waivers must be voluntary, and they must be knowing intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Lee,* 66 M.J. at 388 (internal citations and quotation marks omitted). Additionally, we are required to "indulge every reasonable presumption against the waiver." *Id.*

This case raises two types of potential conflicts of interest. First, and the more familiar, stems from representing co-actors. The second, and unique to a system that addresses collateral attacks on direct appeal, stems from representing one individual both at trial (even if only during the post-trial processing of the case) and on appeal. The latter issue being even more unusual when one of the assigned errors on appeal includes ineffective assistance during the trial stage.

Having identified several potential conflicts of interest, we must now determine how to resolve them.[7] The discussion to R.C.M. 901(d)(4) provides that when "it appears that any defense counsel may face a conflict of interest" at trial, "the military judge should inquire into the matter, advise the accused of the right to effective assistance of counsel, and ascertain the accused's choice of counsel." *See also Akbar*, 2012 CCA LEXIS 247, at *40; *United States v. Lindsey*, 48 MJ 93, 98 (C.A.A.F. 1998). However, unlike the military judge presiding over a court-martial, this court cannot resolve these issues through a detailed colloquy with appellant.

Based on the specific facts of this case and the interwoven nature of these potential conflicts, we have determined that the most appropriate course of action is to remand the case for a hearing pursuant to *United States v. DuBay* to determine whether appellant has conflict-free appellate counsel, and, if not, whether the appellant wishes to make an informed waiver of his right to conflict-free counsel. *See Lee*, 66 M.J. at 390 (remanding for a *DuBay* hearing). This court is ill-suited to make this initial determination.

> Relevant factors in determining whether there is potential for adverse effect include the duration and intimacy of the lawyer's relationship with the client or clients involved, the functions being performed by the lawyer, the

---

[7] As this court only attempts to identify *potential* conflicts of interest, nothing in this opinion should be construed as a finding of misconduct, nor should it be understood as attempting to interfere with appellant's choice of counsel. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (a person has a Sixth Amendment right to choose representation).

> likelihood that actual conflict will arise and the likely
> prejudice to the client from the conflict if it does arise.
> The question is often one of the proximity and degree.

AR 27-26, Appendix B, comment to Rule 1.7.

### B. Post-Trial Action

As discussed above, appellant's supplemental assignment of error argues that the government erred in not presenting to the convening authority appellant's full R.C.M. 1105 submissions. In response, the government claims that they submitted appellant's final submission and additionally verified that it was the "full" matters he wanted submitted.

As an initial matter we note that were this case tried today, there would be several obstacles to attacking the credibility of a victim's trial testimony by referring to mental health records not admitted into evidence.[8] However, as none of these statutory and regulatory changes were in effect at the time of appellant's court-martial, we will apply the law applicable to this case.

An appellant must be "afforded a full opportunity to present matters to the convening authority prior to his action on the case." *United States v. Hawkins*, 34 M.J. 991, 995 (A.C.M.R. 1992); *United States v. Fordyce*, 69 M.J. 501, 504 (Army Ct. Crim. App. 2010). We do not believe this opportunity happened here. In so

---

[8] First, on 17 June 2015, the President signed Executive Order 13,696 ("2015 Amendments to the Manual for Courts-Martial, United States"). Exec. Order No. 13,696, 80 Fed. Reg. 35,783 (Jun. 22, 2015). Included in the executive order, which was effective only for cases where arraignment had not yet occurred, were substantial changes to Mil. R. Evid. 513. *See generally DB v. Lippert*, ARMY MISC 20150769, 2016 CCA LEXIS 63, at *13 (Army Ct. Crim. App. 1 Feb. 2016).

Second, in 2013 Article 60(b)(5), UCMJ, was amended to prohibit the convening authority from considering "any matters that *relate* to the character of a victim unless such matters were presented as evidence at trial and not excluded at trial." (emphasis added). *See* National Defense Authorization Act for Fiscal Year 2014, Pub. L. 113–66, §1706, 127 Stat. 672, 954-69 (2013). The submissions in question involve mental health records, not presented as evidence at trial, that appellant claims contradict the victim's testimony at trial. The effective date of that provision only applies to offenses committed after 24 June 2014. *See* Pub. L. 113–66, §1706(d)(2), Dec. 26, 2013, 127 Stat. 958, as amended by Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, Pub. L. 113–291, §531(g)(2)(A), 128 Stat. 3365 (2014).

determining, we do not think it necessary for us to identify with precision the source of this error. *See Fordyce*, 69 M.J. at 504 (ordering a new convening authority action but declining to specifically find any error). There was sufficient confusion in the submission of appellant's post-trial matters that–regardless of the cause– appellant did not have a "full opportunity" to present matters to the convening authority.

Accordingly, in an exercise of our discretionary authority under Article 66(c), we will direct a new action by the convening authority. For purposes of judicial economy, and because we find no prejudice to appellant in doing so, we will order the new convening authority action take place immediately following a *DuBay* hearing regarding conflict free counsel.

## CONCLUSION

The convening authority's initial action, dated 17 September 2014, is set aside.

The record of trial is returned to The Judge Advocate General for such action as is required to conduct a limited hearing pursuant to pursuant to *United States v. DuBay*.

The purpose of the *DuBay* hearing is to determine whether appellant has conflict-free appellate counsel, and if not, to develop a record of whether any conflict has been appropriately waived. At the hearing, the *DuBay* military judge shall discuss with appellant his right to conflict-free counsel. The *DuBay* military judge shall include in that discussion the potential conflicts of interest raised by this case. In identifying potential conflicts of interest, the military judge is not limited to those potential conflicts identified in this opinion. For each potential conflict of interest identified, the military judge shall determine whether appellant wishes to waive his right to conflict-free counsel, and, if applicable, determine whether SPC JA has also waived any conflict. *See generally* Dep't of Army, Pam. 27-9, Legal Services: Military Judge's Benchbook, para. 2-7-3 (10 Sep. 2014) ("Waiver of Conflict Free Counsel").[9]

Upon the conclusion of the *DuBay* hearing, the record of trial shall be forwarded for a new staff judge advocate recommendation and a new initial action by the same or a different convening authority in accordance with Article 60(c)-(e).

---

[9] We acknowledge that intervening circumstances may make the hearing unnecessary if, by the time the *DuBay* hearing is to commence, the issue of whether appellant has conflict-free counsel has been resolved. In such a case, the military judge shall make brief written findings explaining why the hearing is not necessary.

VIDAL—ARMY 20130892

*See United States v. Mendoza*, 67 M.J. 53, 55 (C.A.A.F. 2008) ("A new, as opposed to a corrected, action requires a new [staff judge advocate or legal officer's recommendation] under R.C.M. 1106 and the opportunity for the accused to submit additional matters under R.C.M. 1105.").

Senior Judge HAIGHT and Judge CAMPANELLA concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

14